Revised April 4, 2002

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 00-31171

RUSSELL J. HENDERSON, ET AL

Plaintiffs

RUSSELL J. HENDERSON, DORREEN KEELER, ROBERT H. LOEWY and
GREATER NEW ORLEANS SECTION OF THE NATIONAL COUNCIL OF JEWISH WOMEN

Plaintiffs-Appellees

VERSUS

RICHARD J. STALDER, Secretary, Department of Public Safety and
Corrections and
JOHN KENNEDY, State Treasurer

Defendants-Appellants

Appeal from the United States District Court
for the Eastern District of Louisiana

March 29, 2002

Before DAVIS and JONES, Circuit Judges, and BARBOUR,[*] District

Judge.

---

[*] District Judge of the Southern District of Mississippi,
sitting by designation.

WILLIAM H. BARBOUR, JR., District Judge:

The Secretary of the Department of Public Safety and Corrections and the Treasurer of the State of Louisiana bring this appeal to challenge the Order of the district court which granted a preliminary injunction in favor of Appellees and thereby halted the implementation of Louisiana Revised Statute 47:463.61, which authorizes a prestige license plate bearing a "Choose Life" message. We find that the Appellees lacked standing to challenge the constitutionality of La. Rev. Stat. 47:463.61. We therefore reverse the district court, vacate its preliminary injunction and remand with instruction to dismiss the complaint.

**I.**

The Plaintiff-Appellees, Russell J. Henderson, Doreen Keeler, Robert H. Loewy, and Greater New Orleans Section of the National Counsel of Jewish Women ("NCJW")[2] instituted this suit against the Secretary of the Department of Public Safety and Corrections and the Treasurer of the State of Louisiana, seeking a declaration that La. Rev. Stat. 47:463.61 is unconstitutional and an injunction prohibiting its enforcement. The challenged law established a

---

[2] Eugene LaMothe and Planned Parenthood of Louisiana were added as plaintiffs to the case subsequent to the interlocutory appeal. Although not named parties to the appeal, we have considered whether these later added plaintiffs have standing to challenge the constitutionality of the Choose Life statute.

2

"Choose Life" automobile license plate for private automobiles, provided there are a minimum of one hundred applicants for the plate. The annual fee for the Choose Life plate is $25.00 which is paid in addition to the usual yearly motor vehicle licensing fee. An additional $3.50 handling fee is charged to offset administrative costs.

Under the statute, the $25.00 fee will be deposited into the state treasury and thereafter distributed based on recommendations of the "Choose Life" Advisory Council ("Council"). The Council, comprised of the president or designee of the American Family Association, the Louisiana Family Forum, and the Concerned Women of America organizations, is responsible for reviewing grant applications and making recommendations with regard to the manner in which funds should be distributed. Distribution of the funds generated by the Choose Life license plate must be made to tax-exempt organizations which provide "counseling and other services intended to meet the needs of expectant mothers considering adoption for their unborn child" or "to meet the needs of infants awaiting placement with adoptive parents." Organizations "involved in, or associated with counseling for, or referrals to, abortion clinics, providing abortion-related procedures, or pro-abortion advertising" are disqualified from receiving funds generated by the Choose Life plate.

3

Plaintiffs filed a lawsuit challenging the constitutionality of La. Rev. Stat. 47:463.61 in the United States District Court of the Eastern District of Louisiana. Specifically, they allege that the subject statute abrogates their right to free speech, constitutes an impermissible establishment of religion, and denies them their right to due process in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs sought a declaratory judgment that La. Rev. Stat. 47:463.61 is unconstitutional and an injunction against its enforcement. On August 23, 2000, a hearing on the Motion for Preliminary Injunction was held before United States District Judge Stanwood R. Duval, Jr. In the Order and Reasons, entered on August 29, 2000, the district court found that the plaintiffs had failed to show that a preliminary injunction should issue with regard to their Establishment Clause claim. The district court, however, found that the plaintiffs established a likelihood of success on the merits of their free speech claim.

Before the district court, plaintiffs argued that La. Rev. Stat. § 47:463.61 violates the First Amendment to the United States Constitution because it discriminates based on viewpoint by allowing only the "pro-life" viewpoint to be expressed via special license plates and pro-choice car owners are not given the option of expressing their view on their license plates. Defendants argued that the Choose Life license plate constitutes an expression

4

of "state speech" and, therefore, did not create a forum for private speech. The district court rejected the argument of the defendants. The district court concluded that prestige license plates are "speech" for the purpose of First Amendment analysis and that they constitute a non-public forum thereby requiring the State to maintain view-point neutrality with regard to the messages displayed. The district court then concluded that as "the State has taken the position that [the "Choose Life"] message is its own ... it appears at this juncture that the State fails in its responsibility to provide a viewpoint-neutral forum, and [La. Rev. Stat. 47:463.61] will probably be found to be an unconstitutional violation of the First Amendment right to free speech."[3]

The district court also rejected the defenses raised by the defendants. In deciding the merits of defendants' ripeness argument, the court found that the case was ripe for adjudication as the State, by statutorily authorizing the display of prestige license plates, had created a non-public forum which allowed for viewpoint discrimination. On the defense of standing, the district court did not focus its analysis on whether plaintiffs had established standing to challenge the constitutionality of the Choose Life statute. Instead, the court held that: "Once free speech has been abridged in such a manner, there is no case law

---

[3] Henderson, et al. v. Stalder, et al., 112 F. Supp. 2d 589, 599 (E.D. La. 2000).

5

supporting the proposition that those individuals whose speech has been restrained in this particular forum must wait ... to have an opportunity to express an opposing viewpoint in that forum."[4] As such, the court concluded it unlikely that the defenses raised by the defendants would be recognized.

The district court, having concluded that the plaintiffs had established a likelihood of success on the merits of their free speech claim and that it was unlikely that the defenses raised were cognizable, granted a preliminary injunction thereby (1) enjoining the enforcement and implementation of La. Rev. Stat. § 47:463.61 and (2) halting production of the Choose Life license plate. Defendants appeal from the order granting the preliminary injunction.

## II.

**Standing**

Under the dictates of Article III of the United States Constitution, federal courts are confined to adjudicating actual "cases" and "controversies." U.S. CONST. art. III, § 2, cl. 1. Of the doctrines that have evolved under Article III, including standing, mootness, ripeness, and political question, the requirement that the litigant have standing is perhaps the most

---

[4] Id. at 601.

important.  See Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324 (1984).  This doctrine:

> [E]mbraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

Id. 468 U.S. at 741, 104 S. Ct. 3315 (citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 474-75, 102 S. Ct. 752, 760 (1982)).  Standing, at its "irreducible constitutional minimum," requires a plaintiff "to demonstrate:  they have suffered an 'injury in fact'; the injury is 'fairly traceable' to the defendant's actions; and the injury will 'likely ... be redressed by a favorable decision." Public Citizen, Inc. v. Bomer, 274 F.3d 212, 217 (5th Cir. 2001) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)).  "[A]n injury in fact [is] an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560, 112 S. Ct. at 2136.

In the case *sub judice*, the plaintiffs allege different injuries all of which they contend arise because of the enactment of the Choose Life statute.  It is on these injuries that standing must be predicated.  We now consider whether any of the plaintiffs

7

have alleged an injury in fact, which is fairly traceable to the Choose Life statute that will be redressed in the event that statute is enjoined and/or declared unconstitutional.[5] We will discuss each basis for standing separately.

## 1. Taxpayer Standing

Plaintiffs Henderson, Keeler, Loewy, and LaMothe, all of whom allege that they pay income tax to the State of Louisiana, allege injury based on the use of their tax money (1) to make and distribute the Choose Life license plate and (2) for the administration of the Choose Life statute including the establishment and maintenance of the Choose Life Council and Fund. The United States Supreme Court has held that state taxpayers, like federal taxpayers, ordinarily lack a sufficient personal stake to challenge laws of general applicability, since their own injury is not distinct from that suffered by taxpayers in general. Asarco, Inc. v. Kadish, 490 U.S. 605, 614, 109 S. Ct 2037, 2043 (1989) (plurality opinion) (citing Frothingham v. Mellon, 262 U.S. 447, 487, 43 S. Ct. 597, 601 (1923)). Therefore, in cases in which a

---

[5] This court is obliged to raise the jurisdictional issue of standing *sua sponte* despite the parties' failure to raise it. Moreover, the plaintiffs' skeletal allegations–e.g., that they are state income taxpayers; that Keeler wants to purchase a license plate expressing pro-choice views; and that Loewy's and LaMothe's "religious beliefs are harmed by the statute"–do not require further development in order to assess their standing to challenge the statute.

state taxpayer challenges the constitutionality of a state law, he "must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, not merely that he suffered in some indefinite way in common with people generally." Doremus v. Board of Educ. of Hawthorne, 342 U.S. 429, 434, 72 S. Ct. 394,397 (1952).

In the case *sub judice*, the state taxpayer plaintiffs first allege injury in the form of the use of their state income tax dollars to manufacture and distribute the Choose Life license plate. We find that this allegation is insufficient for standing purposes as it does not show that the state taxpayer plaintiffs have sustained or will sustain a direct pecuniary injury, i.e. an injury in fact, because of the manufacture or distribution of the Choose Life license plate. This conclusion is predicated, in part, on the fact that there is no suggestion that the prestige license plates cost more for the State to manufacture or distribute to motor vehicle drivers than do non-prestige license plates. Second, motorists who elect to use the Choose Life license plate are required to pay the regular motor vehicle license fee when registering their vehicles and an additional charge of $3.50 to offset the administrative costs associated with the issuance of the prestige license plates. See La. Rev. Stat. § 47:463(A)(3) (requiring payment of $3.50 handling charge to "offset the

9

administrative costs of the department for the issuance of [prestige license] plates."). Third, the state taxpayer plaintiffs have not alleged that the amount they pay to the State in the form of income taxes will increase because of the enactment of La. Rev. Stat. § 47:463.61. We conclude that the injury complained of by the state taxpayer plaintiffs, i.e., the use of tax dollars to manufacture and/or distribute the Choose Life license plate, is insufficient to confer standing as the injury complained of is, at best, speculative and, at most, constitutes a generalized grievance common to all tax payers in the state.

The state taxpayer plaintiffs also allege injury based on the use of their tax dollars to administer the provisions of La. Rev. Stat. § 47:463.61, which require the establishment and maintenance of the attendant Choose Life Council and Fund. This "injury" must be read in conjunction with the allegations of plaintiffs Loewy, LaMothe, and Greater New Orleans Section of the National Council of Jewish Women ("NCJW") which allege that the Choose Life statute impermissibly advances Christian fundamentalism. In this context, it appears that the injury complained of by the state taxpayer plaintiffs arises because of alleged use of their state income tax dollars to administer a statute which violates the Establishment Clause.

Plaintiffs Loewy, LaMothe, and the NCJW allege that they will be injured by the implementation of La. Rev. Stat. 47:463.61 as

10

that statute harms their religious beliefs and/or principles and endorses Christian fundamentalism. In support of this assertion, these plaintiffs argue that the mandatory members of the Choose Life Council belong to organizations, namely the American Family Association, the Louisiana Family Forum, and the Concerned Women for America, all of which allegedly espouse a belief in Christianity as evidenced by statements contained on their respective internet web sites.

We have consistently recognized that the injury alleged by a plaintiff for standing purposes must be "'concrete and particularized and ... actual or imminent, not conjectural or hypothetical' to pass constitutional muster." Association of Cmty. Orgs. for Reform v. Fowler, 178 F.3d 350, 358 (5th Cir. 1999) (quoting Lujan, 504 U.S. at 560-61, 112 S. Ct. at 2316). We find the Establishment Clause challenge by Loewy, LaMothe, and the NCJW is predicated on an injury based in conjecture and, therefore, insufficient for federal standing purposes. The argument advanced by these plaintiffs is that because the Choose Life Council is to be comprised of individuals who belong to organizations that allegedly espouse Christian ideologies, the actions taken by the Council, presumably with regard to the manner in which the Choose Life Fund is distributed, will either advance Christianity or will otherwise interfere with their own religious beliefs or principles. There is, however, no allegation that the mandatory members of the

11

Council have yet distributed any money from the Choose Life Fund or that in so doing, or contemplating distributions, they have actually advanced the religious ideologies of their respective organizations or religion in general. At best, the focus of the alleged injury complained of by these plaintiffs arises because of an appearance of future impropriety, which we have found insufficient to confer standing. Bomer, 274 F.3d at 218. Accordingly, we find that plaintiffs Loewy, LaMothe and NCJW, in alleging injury based on the manner in which the Choose Life statute would be administered, have failed to allege "an injury in fact" and, therefore, lack standing to challenge the facial constitutionality of that statute.[6] We turn now to the complained of injury to the state taxpayer plaintiffs.

The state taxpayer plaintiffs allege that they will be injured by the use of their income tax dollars to administer the provisions of the Choose Life statute. We have held that to establish taxpayer standing to challenge the constitutionality of a state statute on the basis of the Establishment Clause, a party must show that "tax revenues are expended on the disputed practice." Doe v. Duncanville Ind. Sch. Dist., 70 F.3d 402, 408 (5th Cir. 1995).[7]

---

[6] The unavailability of a facial challenge does not imply, of course, that an as-applied challenge at some future date after implementation of this statute would be foreclosed.

[7] Unlike the general test for taxpayer standing, which requires "direct injury" to the taxpayer, See Asarco, supra, the

The terms of the Choose Life statute contradict the plaintiffs' allegation that state income tax dollars would be used for the administration of either the Choose Life Council or the Choose Life Fund. Under the statute, members of the Council serve on a voluntary basis and are not provided "compensation or reimbursement of any type." La. Rev. Stat. § 47:463.61(E)(1). Additionally, the statute requires the payment of an additional $3.50 fee, in addition to the regular motor vehicle license fees, to offset a portion of the associated administrative costs. Id. at § 47:463.61(C). Under these facts, we find that the complained of injury of the state taxpayer plaintiffs, i.e., use of their income tax dollars to administer the Choose Life statute, is insupportable and, therefore, insufficient to confer standing to challenge the constitutionality of that statute.

## 2. Individual Standing

Plaintiff Keeler alleges injury based on the enactment of La. Rev. Stat. 47:463.61 in that "there is no similar 'Pro-Choice' prestige license plate to allow her to express her pro-choice view on her passenger car license plate."[8] We find that this alleged

---

Supreme Court's test in Establishment Clause cases requires only income taxpayer status and the showing of a direct expenditure of income tax revenues on the allegedly unconstitutional program. Flast v. Cohen, 392 U.S. 83, 88 S. Ct. 1942 (1962).

[8] Amended Complaint, ¶ 20.

13

injury fails under the third requirement for federal standing purposes.

To establish standing to challenge the constitutionality of a statute, a plaintiff must show that the injury about which he complains will "likely ... be redressed by a favorable decision" of the court." Lujan, 504 U.S. at 560-61, 112 S. Ct. at 2136. The injury complained of by Keeler is that she has been denied the opportunity to express her pro-choice point of view. The relief requested by Keeler is a declaratory judgment that La. Rev. Stat. § 47:463.61 is unconstitutional. We find that even if the Choose Life statute is declared unconstitutional, Keeler's complained of injury would not be redressed as that remedy will not provide Keeler a forum in which to express her pro-choice viewpoint. Instead, the requested relief would merely function to prevent other motor vehicle drivers from expressing their choose-life point of view. As we conclude that Keeler's complained of injury cannot be redressed by a declaration of the court that the Choose Life statute is unconstitutional, we find that she does not have standing to challenge the constitutionality of that statute.

## 3. Organizational Standing

Plaintiff Planned Parenthood of Louisiana ("PPL") alleges that La. Rev. Stat. 47:463.61 violates its right to speak and to due process of the law in violation of the First and Fourteenth

14

Amendments to the United States Constitution. The injury complained of by this organization is that, by the language of the Choose Life Statute, it is ineligible for grants through the Choose Life Fund because it makes referrals to abortion clinics and engages in pro-choice advertising.

"An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." Fowler, 178 F.3d at 356 (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S. Ct. 1114, 1124 (1982)). We find that PPL fails to satisfy the redressibility requirement of Article III standing. The injury complained of by PPL arises from its alleged exclusion from eligibility to receive grants from the Choose Life Fund because it engages in abortion-related activities. The relief requested by PPL in federal court is a declaratory judgment that La. Rev. Stat. § 47:463.61 is unconstitutional. We find that even if the Choose Life statute is declared unconstitutional, the injury complained of by PPL would not be redressed because there would then be no fund from which PPL could seek grants. As we conclude that the injury complained of by PPL would not be redressed by a judicial declaration that La. Rev. Stat. § 47:463.61 is unconstitutional, we find that PPL has not established that it has standing to challenge that statute.

**III.**

15

We hold that the plaintiffs in this case have not shown that they have standing to challenge the constitutionality of Louisiana Rev. Stat. § 47:463.61.  We therefore find that the preliminary injunction granted by the district court judge must be dismissed for lack of federal court jurisdiction under Article III of the United States Constitution.

The judgment of the district court is REVERSED, VACATED, and REMANDED for an entry of dismissal.

**Appendix A**

Louisiana Revised Statute 47:463.61 provides:

A.    The secretary of the Department of Public Safety and Corrections shall establish a special prestige license plate to be known as the "CHOOSE LIFE" plate, provided there be a minimum of one hundred applicants for such plate.  The license plate shall be restricted to passenger cars, pickup trucks, vans, and recreational vehicles.   The license plate shall be of a color and design selected by the Choose Life Advisory Council provided it is in compliance with R.S.   47:463(A)(3),  and  shall  bear  the  legend "Choose Life".
B.   The prestige license plate shall be issued, upon application, to any citizen of Louisiana in the same manner as any other motor vehicle license plate.
C.   The annual fee for this special prestige license plate shall be twenty-five  dollars,  in  addition  to  the  regular  motor  vehicle license  fee  provided  in  R.S.  47:463,  to  be  distributed  in  the manner set forth in Subsection F of this Section and a three dollar and fifty cent handling fee to be retained by the department to offset a portion of administrative costs.
D.   The department shall collect the fee for the prestige license plate and forward the fee to the state treasurer for immediate deposit on the state treasury.
E.   (1) A Choose Life Advisory Council, hereinafter referred to as the  "Council",  shall  be  established  to  design  and  review  grant applications  for  qualifying  organizations,  and  shall  make recommendations  regarding  the  awarding  of  grants  to  the  state treasurer.  Members of the Council shall serve one-year terms, on a voluntary basis, commencing on October 1, 1999, and shall receive no compensation or reimbursement of any type.  Council members are hereby  authorized  to  serve  successive  terms.   The  Council  shall meet  at  least  annually,  and  shall  be  comprised  of  the  following members:
        (a)   The president, or his designee, from the American Family Association.
        (b)   The president, or his designee from the Louisiana Family Forum.
        (c)   The president, or his designee, from the Concerned Women for America organization.
(2) At the discretion of the Council, membership may be extended to add members representing the following:
        (a) Physicians specializing in obstetrics.
        (b) Physicians specializing in pediatrics.
        (c) Women who have surrender children for adoption.
        (d) Couples who have adopted children.

17

(e) Adoption advocacy groups.
(f) Board-certified social workers.
(g) Certified counselors.

F.    (1) After compliance with the requirements of Article VII, Section 9(B) of the Constitution of Louisiana relative to the Bond Security and Redemption Fund, an amount equal to the monies received by the state treasury pursuant to provisions of Subsection D of this Section shall be deposited into the Choose Life Fund, which is hereby created as a special fund in the state treasury and hereafter referred to as the "Fund".    All unexpected and unencumbered monies in the fund at the end of the fiscal year shall remain in the fund.    Monies in the fund shall be invested by the state treasurer in the same manner as monies in the state general fund and interest earned on the investment of such monies shall be deposited into the fund.    Monies in the fund shall only be withdrawn pursuant to an appropriation by the legislature solely for the purposes provided by this Section.

(2) An organization wishing to qualify for receipt of funds shall submit an affidavit affirming its qualifications, which shall include a pledge to spend the money in accordance with the provisions of this Section, to the Council and shall qualify as tax exempt under Section 501(c)(3) of the Internal revenue Code of 1954, as amended.    Furthermore, an organization wishing to qualify for receipt of funds shall demonstrate it provides counseling and other services intended to meet the needs of expectant mothers considering adoption for their unborn child.    No monies deposited into the fund shall be distributed to any organization involved in, or associated with counseling for, or referrals to, abortion clinics, providing medical abortion-related procedures, or pro-abortion advertising.

(3) Organizations receiving monies under this Section shall use at least fifty percent of such funds to provide for the material needs of expectant mothers considering adoption for their unborn child, including clothing, housing, medical care, food, utilities, and transportation.    Such monies may also be used to meet the needs of infants awaiting placement with adoptive parents.    The remaining funds may be used for counseling, training, and providing pregnancy testing, but shall not be used for administrative, legal, or capital expenditures.

G.    The state treasurer, based on the recommendations of the Council, shall annually disburse from the funds an equal amount to each of the qualifying organizations, and shall make available, upon request, the name and the amount of monies disbursed to each organization.    An organization receiving monies from the fund may be required to submit an annual audit prepared by a certified public accountant, at the discretion of the state treasurer and the Council.    The state treasurer and the Council shall review the

distribution and expenditure of funds under this Section at least once every three years to ensure funds are disbursed and expended in accordance with the provision of this Section.

H.   The secretary may establish rules and regulations to implement the provisions of this Section, including but not limited to rules and regulations governing the collection and disbursement of fees, the transfer and disposition of such license plates, the colors available, and the design criteria.

EDITH H. JONES, Circuit Judge, concurring:

I concur fully in Judge Barbour's opinion.[9] I write separately to respond to a few points made by Judge Davis in his dissent, even though the dissent touches only plaintiff Keeler's standing.

I respectfully disagree with Judge Davis. His conceptualization of Keeler's alleged injury would take us far afield from the requirements of Article III of the Constitution. As a general proposition, a plaintiff who complains merely that a benefit has been unconstitutionally granted to others is asserting only a "generalized grievance" that does not allow the plaintiff standing to obtain judicial relief for the alleged wrong in federal court. A plaintiff cannot have standing unless he or she alleges "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324

_____

[9] We have treated this case as if it involved no more than the First Amendment consequences of the legislature's decisions to allow groups to obtain specialty license plates. The entire program, however, is more complex, involving the transfer of excess revenues from the program to various private groups, such as adoption agencies in the case of the pro-life plates. It might well be contended that the state has adopted a program to foster adoption by means of "selling" specialty plates to like-minded citizens. The appellees' standing would nevertheless founder, in my view, under such an analysis just as it does in Judge Barbour's opinion.

(1984).  An allegation of discriminatory benefit favoring others, without more, cannot meet these requirements.

Part II of the dissent suggests that in a First Amendment facial challenge to a legislative enactment, Article III's requirements of injury-in-fact, causation and redressability need not be met.  But these requirements are not optional.  "Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States," Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 475-76, 102 S.Ct. 752, 760 (1982); and injury-in-fact, causation and redressability are the three essential elements of the "irreducible constitutional minimum of standing" required by Article III.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992).[10]  The requirements apply in First Amendment cases no less than in other cases,[11] including cases in

---

[10]    See Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758.  See also Raines v. Byrd, 521 U.S. 811, 818-20, 117 S.Ct. 2312, 2317-18 (1997).

[11]    See, e.g., FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-36, 110 S.Ct. 596, 607-10 (1990); Meese v. Keene, 481 U.S. 465, 472-77, 107 S.Ct. 1862, 1866-69 (1987); Valley Forge Christian College, 454 U.S. at 488-90, 102 S.Ct. at 767-68; Society of Separationists v. Herman, 959 F.2d 1283, 1285 (5th Cir. 1992) (en banc); Doe v. Sch. Bd. of Ouachita Parish, 274 F.3d 289, 291-92 (5th Cir. 2001).

which a plaintiff challenges an enactment on its face.  See, e.g.,

Larson v. Valente, 456 U.S. 228, 233-36, 238-44, 102 S.Ct. 1673,

1677-79, 1680-83 (1982) (holding that plaintiffs had Article III

standing to bring Establishment Clause challenge to statute as

applied and on its face).[12]

Further, the cases cited in part II of Judge Davis's

dissent fail to support his argument.  The plaintiffs in those

cases actually met the requirements of Article III, including its

redressability requirement.[13]  This is not true of plaintiff

_____

[12]  Although various prudential standing principles have been
relaxed in some First Amendment cases, this relaxation does not
eliminate the distinct and independent requirement of Article III
that the dispute between the parties must amount to a case or
controversy.  See Sec'y of State of Md. v. Joseph H. Munson Co.,
Inc., 467 U.S. 947, 956-58, 104 S.Ct. 2839, 2846-47 (1984).  See
also Valley Forge Christian College, 454 U.S. at 475, 102 S.Ct. at
760 (satisfaction of requirements of prudential standing cannot
substitute for Article III requirements); Lac Vieux Desert Band of
Lake Superior Chippewa Indians v. Mich. Gaming Control Bd., 172
F.3d 397, 407 (6th Cir. 1999).  Compare City of Chicago v. Morales,
527 U.S. 41, 55 n.22, 119 S.Ct. 1849, 1858 n.22 (1999) (opinion of
Stevens, J., joined by Souter, J., and Ginsburg, J.) ("When
asserting a facial challenge, a party seeks to vindicate not only
his own rights, but those of others who may also be adversely
impacted by the statute in question.  In this sense, the threshold
for facial challenges is a species of third party (jus tertii)
standing, which we have recognized as a prudential doctrine and not
one mandated by Article III of the Constitution.") (citing Joseph
H. Munson Co., 467 U.S. at 955, 104 S.Ct. at 2846).

[13]  In all but one of the cases cited in part II of Judge
Davis's dissent, the appellant or appellants who complained of a

22

Keeler, who seeks a remedy that would not redress her alleged injury.

Part III of the dissent argues that plaintiff Keeler's challenge in this case to La. R.S. 47:463.61 meets the requirements of Article III. The two cases cited for this argument are distinguishable. In Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102 (1979), the appellant sought a ruling that he "not be required to pay alimony if similarly situated wives could not be ordered to pay." Id. at 271, 99 S.Ct. at 1107. It was not clear whether he also sought alimony for himself. Id. & n.2. The Supreme Court reversed an unfavorable state court ruling after concluding that Orr had standing to raise his challenge.

---

First Amendment violation had been convicted of violating an ordinance or statute; a favorable decision in the Supreme Court would invalidate the conviction or convictions of each appellant or group of appellants in these cases. The only exception is City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 108 S.Ct. 2138 (1988), in which a newspaper publisher brought a facial challenge to a statute requiring the publisher to obtain a permit before placing its newsracks on public property. The statute obstructed the exercise of the publisher's First Amendment rights; invalidating the statute for unconstitutionality would remove this obstacle. City of Lakewood would prove Judge Davis's point if the publisher had sought to obtain an injunction preventing another newspaper from placing newsracks on private property, and if the Court had held that the newspaper had standing to seek the injunction against its rival; but these were not the facts.

23

The Supreme Court noted that it was "possible" that a favorable ruling for Orr in the Court "will not ultimately bring him relief from the alimony judgment outstanding against him, as the State could respond to a reversal by neutrally extending alimony rights to needy husbands as well as wives." Id. at 271, 272, 99 S.Ct. at 1108. Because the Court "ha[d] no way of knowing how the State w[ould] in fact respond" to a ruling striking down the state's alimony laws, Orr had standing. Id. To hold otherwise would be "to hold that underinclusive statutes can never be challenged because any plaintiff's success can theoretically be thwarted." Id. (emphasis in original). The Court went on to say that "[t]he holdings of the Alabama courts stand as a total bar to appellant's relief; his constitutional attack holds the only promise of escape from the burden that derives from the challenged statutes." Id. at 273, 99 S.Ct. at 1108.

In Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 107 S.Ct. 1722 (1987), the Arkansas Writers' Project, Inc. sought a refund of sales taxes it had paid, arguing that a statutory tax exemption must be extended to include a magazine that it published. Id. at 225, 107 S.Ct. at 1725. On appeal to the Supreme court, the state revenue commissioner argued that the

24

Project lacked standing to challenge the tax scheme because its claimed injury could not be redressed by a decision of the Court. The Court rejected this view of standing, which "would effectively insulate underinclusive statutes from constitutional challenge, a proposition we soundly rejected in Orr v. Orr." Ragland, 481 U.S. at 227, 107 S.Ct. at 1726 (citation omitted). In previous decisions, the Court said, it had "considered claims that others similarly situated were exempt from the operation of a state law adversely affecting the claimant." Id. Quoting Orr's "only promise of escape" language, the Court concluded that the Project had alleged an adequate personal stake in the outcome of the litigation. 481 U.S. at 227, 107 S.Ct. at 1726-27. The Court held on the merits that the Arkansas "tax" -- not the exemption -- violated the First Amendment. 481 U.S. at 234, 107 S.Ct. at 1730.

This case is different from Orr and Ragland for at least two reasons. First, holding in favor of Keeler in this case would not merely present the "possibility" of a result that would not redress the wrong of which the plaintiff complains. If the relief requested by Keeler is granted, there is no possibility whatsoever that the relief will redress any constitutionally cognizable injury-of-fact of which she could be said to complain.

Invalidating a statute that, on Keeler's theory, allows third-party anti-abortion speakers to exercise their First Amendment rights in a constitutionally protected forum will do nothing to help <u>Keeler</u> speak within that alleged forum.[14]  The relief sought by Keeler cannot redress the constitutionally cognizable injury of which Keeler complains.  <u>Cf.</u> <u>Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.</u>, 528 U.S. 167, 185, 120 S.Ct. 693, 706 (2000) ("a plaintiff must demonstrate standing separately for each form of relief sought").

Second, Keeler's constitutional attack does not "hold[] the only promise of escape from the burden that derives from the challenged statutes."  Keeler and the other plaintiffs in this action have challenged only La. R.S. 47:463.61, not the other Louisiana statutes that (either alone or viewed in conjunction with this statute) could be said to constitute the scheme that causes the alleged constitutional violation of which the plaintiffs complain.  Only if Keeler challenged the broad scheme for specialty plates would she be in the same position as the appellant in <u>Orr</u>.

---

[14]   Judge Davis hypothesizes that "a declaratory judgment in Keeler's favor might also have the effect of removing the benefit granted to those who wish to display the Choose Life plate."  This is euphemistic: such a declaratory judgment <u>would</u> have such an effect -- immediately and without question.

Favorable redress could then result either in the state's allowing her to place pro-choice sentiments on specialty license plates or in the state's shutting down the alleged First Amendment forum by banning, or ceasing to sponsor, all specialty plates. But this is not Keeler's aim.

As a final note, Judge Davis's view of standing would transform the First Amendment into a device for censorship rather than the enhancement of free speech. Under traditional free speech jurisprudence, the remedy for a speaker's unjust exclusion from a forum is to admit the speaker, in other words, to afford Keeler access to specialty plates. Rosenberger v. Rectors of the Univ. of Virginia, 515 U.S. 819, 828-30, 845-46, 115 S.Ct. 2510, 2516-17, 2524-25 (1995). Judge Davis's acceptance of Keeler's concept of injury would lead instead to the removal of a single speaker -- reflecting the anti-abortion viewpoint -- from the forum, with no corresponding enlargement of speaking opportunity for Keeler. The "redress" sought by Keeler not only fails to repair her alleged constitutional deprivation, but it would be, as far as I am aware, unique and fundamentally contrary to the law of free speech.

DAVIS, Circuit Judge, dissenting:

I disagree with the majority's conclusion that the plaintiffs have no standing to bring their First Amendment challenge to Louisiana's Choose Life statute. I therefore dissent.

I.

The majority holds that plaintiff Keeler lacks standing to challenge La. R.S. 47:463.61 because, even if the Choose Life statute is declared unconstitutional, Keeler's complained of injury would not be redressed because that remedy will not provide Keeler with a forum in which to express her opposing pro-choice viewpoint. In the majority's view, the requested relief would merely function to prevent other motor vehicle drivers from expressing their choose-life point of view.

I would define Keeler's injury in a different manner. The plaintiffs alleged that their rights under the First and Fourteenth Amendments have been violated because the Louisiana Legislature, as part of its specialty license plate program, has enacted the Choose Life statute. This statute allows for expression of the choose life message on state prestige license plates, without allowing for the expression of the opposing pro-choice viewpoint in that same

28

forum.  The plaintiffs allege and the State concedes that Louisiana is an anti-abortion state which allows the fact-finder to infer that the Louisiana Legislature will not pass a statute authorizing the expression of a choose choice message.[15]  The plaintiffs have alleged and the district court found that the State has engaged in viewpoint discrimination by authorizing the Choose Life license plate.  As a result, plaintiffs are not and will not be given the opportunity to speak their opposing viewpoint in that same forum. In other words, the plaintiffs are injured by the government's promotion of one side of the debate on the abortion rights issue in a speech forum, coupled with the lack of opportunity to present their opposing view.  "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.  And it may not select which issues are worth discussing or debating in public facilities.  There is an 'equality of status in

---

[15]  This has been made abundantly clear since this appeal was filed.  After the initial briefs were filed in this case, an amendment to the Choose Life legislation was introduced in the last session of the Louisiana Legislature, that, if passed, would have authorized a "Choose Choice" license plate.  The amendment was rejected.

the field of ideas,' and government must afford all points of view an equal opportunity to be heard."[16]

## II.

As the plaintiffs have alleged an injury raising First Amendment concerns, this court may properly apply an expanded notion of standing to determine who may institute a suit for relief.[17] The majority opinion addresses standing utilizing the traditional requirements of injury-in-fact, causation and redressability. Although as discussed below, I would find that plaintiff Keeler satisfies all requirements, that analysis may not be applicable to this case. In Lakewood v. Plain Dealer Pub. Co., the Supreme Court stated specifically,

> Recognizing the explicit protection afforded speech and the press in the text of the First Amendment, our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for and being denied, a license.[18]

---

[16] Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290 (1972)(Emphasis added)(internal citations omitted).

[17] Moore's Federal Practice 3d, § 101.61[5][a].

[18] Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 755-56, 108 S. Ct. 2138, 2143 (1988).

30

In that case, a city ordinance gave the mayor unfettered discretion to grant or deny a permit for placing newspaper dispensing devices on public property. The plaintiff newspaper did not apply for a permit but brought suit to challenge the news rack ordinance. On the issue of standing, the Supreme Court, with no mention of the three requirements listed above, held that the newspaper could bring a facial challenge to the statute without applying for a permit because the requirement of an annual permit is potentially threatening to speech, the license is aimed at expressive conduct and the licensing system threatens freedom of expression because it creates a system by which speech is reviewed without standards.[19] Without standards, speakers denied a license will have no way to prove that a decision against their application was unconstitutionally motivated. Such uncertainty can compel self-censorship when speakers conform their speech to the licensor's preferences.[20] Generally, a facial challenge to a licensing law lies where the law gives a government official or agency substantial power to discriminate based on content or viewpoint of

---

[19] Id. at 2145-46.

[20] Id. at 2145.

speech by suppressing disfavored speech or speakers and the law has a close nexus to expression.[21]

Although cases under this precedent generally deal with situations in which a single government official is given the discretion under the statute to grant or deny a license affecting expressive activity, I see no reason why the principle should not be applied to this case.[22] Both parties agree that the messages on prestige license plates are speech. Louisiana's ad hoc legislative

---

[21]  Id.

[22]  Freedman v. Maryland, 380 U.S. 51, 56, 85 S. Ct. 734 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, *whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license*") (emphasis added); Thornhill v. Alabama, 310 U.S. 88, 97, 84 L. Ed. 1093, 60 S. Ct. 736 (1940) (in the First Amendment context, "[o]ne who might have had a license for the asking may . . . call into question the whole scheme of licensing when he is prosecuted for failure to procure it"). See also Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 22 L. Ed. 2d 162, 89 S. Ct. 935 (1969) ("'The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands'" (quoting Jones v. Opelika, 316 U.S. 584, 602, 86 L. Ed. 1691, 62 S. Ct. 1231 (1942) (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U.S. 103, 104 (1943))); Lovell v. Griffin, 303 U.S. 444, 452, 82 L. Ed. 949, 58 S. Ct. 666, 669 (1938) ("As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it").

process for granting or denying authorization for prestige license plates is analogous to a licensing process to obtain access to expressive activity. The process gives the Louisiana Legislature similar unbridled discretion over messages on prestige license plates, which discretion is limited only by the size of the plate itself. Clearly if the decision to authorize specialty plates were being made by a government official or commission under authority delegated by the legislature, the actions of the official or commission would be subject to judicial review. Leaving that authority directly in the hands of the Louisiana legislature should not change the analysis.[23]

The fact that there is no single statute establishing Louisiana's specialty license plate program does not affect our

---

[23] In <u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147, 151 (1969), parade permits were issued by the Commission, the city's legislative branch. In that case the ordinance conferred upon the City Commission the power to prohibit any "parade," "procession," or "demonstration" on the city's streets or public ways. In deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of "public welfare, peace, safety, health, decency, good order, morals or convenience." The Supreme Court decided that this ordinance as it was written, fell squarely within the ambit of many decisions of the Court holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional.

analysis.[24]  In <u>Niemotko v. Maryland</u>, no ordinance or statute was in place regulating or prohibiting the use of the park.[25]  Rather, a practice had developed vesting authority to grant permits for the use of the park in the Park Commissioner and the City Council.  The court stated, "[n]o standards appear anywhere; no narrowly drawn limitations; no circumscribing of this absolute power; no substantial interest of the community to be served.  It is clear that all that has been said about the invalidity of such limitless discretion must be equally applicable here."[26]  Accordingly, the lack of a statute establishing the specialty license plate program should not prevent the plaintiffs from bringing a facial challenge to the State's system for authorizing specialty license plates.

The Choose Life statute is just one application of a policy adopted by the Louisiana legislature to authorize specialty plates

---

[24]  La.R.S. 47:463.A.(3) is not such a statute.  It merely states that specialty license plates authorized by the legislature "shall contain the uniform alpha-numeric series accompanied by a symbol or emblem representing the organization requesting such a plate."  The statute also contains the requirement that plates issued after August 15, 1999 shall include a handling charge of $3.50 and that no plate shall be established after January 1, 2002 until the department has received a minimum of one thousand applications for the plate.

[25]  340 U.S. 268, 272 (1951).

[26]  <u>Id.</u>

on an ad hoc basis.  It is clear that attacks against an unwritten policy or practice regarding the issuance of licenses for speech are subject to the same constitutional analysis as an attack on a statute or ordinance and should fall within the same standing analysis set forth in Lakewood.  In summary, at its core I view this case as indistinguishable from the decision in Lakewood on the issue of standing.  Further, I see no principled reason why plaintiffs raising free speech claims in this case do not have standing to attack the Choose Life statute as a discrete application of Louisiana's policy regarding authorization of specialty license plates.  This is the single statute under this program that offends them and I see no reason to require them to challenge the entire specialty license plate program.

## III.

Plaintiff Keeler also has standing using the traditional analysis outlined by the majority opinion.  Plaintiff Keeler's injury is personal, not a generalized grievance, based on the allegation that she would purchase a prestige license plate expressing her pro-choice views but is unable to do so.  Based on these allegations, the harm is fairly traceable to, and the direct result of, the State's conduct.  Also, the alleged harm is likely

35

to be redressed by the requested relief. The relief requested is that the court enjoin the implementation of the Choose Life statute and declare it unconstitutional. While this relief will not allow plaintiffs to speak in the specialty license plate forum, it will have the effect of preventing the State from manipulating the content of public debate by presenting only the view favored by the state.

A plaintiff has standing to seek relief in a case such as this when she is aggrieved by a statute, like the Choose Life legislation, that is underinclusive. A person or group excluded from benefits conveyed via an underinclusive statute has standing to challenge the statute on constitutional grounds. This is so even if the effect of striking down the statute is to deny the benefit to the intended group and not extend it to the plaintiffs. For example, in Orr v. Orr, a man who had been ordered to pay alimony to his wife under state laws providing that husbands, but not wives, may be required to pay alimony upon divorce, had standing to challenge the constitutionality, on equal protection grounds, of such alimony laws, notwithstanding that the man made no claim of being entitled to an award of alimony from his divorced

36

wife but challenged only the unequal status of husbands and wives as to the burden of alimony.[27]

The Supreme Court applied this concept to a free speech claim in <u>Arkansas Writers' Project, Inc. v. Ragland</u>.[28]  In <u>Ragland</u>, the state of Arkansas imposed its personal property tax on receipts from sales of general interest magazines, but exempted receipts derived from the sale of newspapers and religious, professional, trade and sports journals.  The publisher of the Arkansas Times, a general interest magazine, contested the assessment of taxes against it on the basis that subjecting the Arkansas Times to the sales tax, while sales of newspapers and other magazines were exempt, violated the First and Fourteenth Amendments.  The Arkansas Times is a magazine that includes articles on a variety of subjects, including religion and sports, but which does not qualify for one of the topic based exemptions.

Taking a position similar to that expressed by the majority opinion, the Commissioner of Revenue of Arkansas argued to the Supreme Court that the Arkansas Times did not have standing to challenge the Arkansas sales tax.  The Commissioner contended that

---

[27]  99 S.Ct. 1102 (1979).

[28]  481 U.S. 221, 107 S.Ct. 1722 (1987).

since the appellant conceded that the Arkansas Times is not a newspaper or religious or sports journal, it had not asserted an injury that could be redressed by a favorable decision of the court. The Commissioner's argument built on the conclusion of the Arkansas Supreme Court that "[I]t would avail [appellant] nothing if it wins its argument . . . It is immaterial that an exemption in favor of some other taxpayer may be invalid, as discriminatory. If so, it is the exemption that would fail, not the tax against the [Arkansas] *Times*. . . . 698 S.W.2d, at 803."[29]  The Supreme Court rejected this argument, stating that such a position "would effectively insulate underinclusive statutes from constitutional challenge, a proposition we soundly rejected in <u>Orr v. Orr</u>, 440 U.S. 268, 272, 99 S.Ct. 1102, 2208 (1979)."  The fact that a decision in favor of the plaintiff would not result in the sales tax exemption being extended to all publications and would do nothing more than remove the benefit of the exemption from other speakers did not prevent a finding that the appellants had standing. The Court viewed the discriminatory exemption granted to others as a burden on the plaintiffs.  The plaintiff's

---

[29]  <u>Id.</u> at 1726.

"constitutional attack holds the only promise of escape from the burden that derives from the challenged statut[e]."[30]

The plaintiffs in today's case presents a similar, and even stronger, case for standing. The Choose Life statute, like the sales tax exemption in Ragland, grants a privilege related to speech to a select group. In our case, the privilege was granted based on the state's support of the viewpoint expressed in the Choose Life license plate. (There does not appear to be viewpoint discrimination in Ragland.) Keeler's standing to bring her claims does not depend on whether the lawsuit seeks to obtain the benefit for herself. It is sufficient, based on Ragland, that Keeler seeks to remove the discriminatory benefit favoring others in a speech context. In other words, the State's manipulation of the playing field for speech by the authorization of the Choose Life license plate, like the tax exemption in Ragland, is a burden on the free speech rights of Keeler. Removal of that discriminatory program will redress Keeler's alleged injury. Just as it was immaterial in Ragland that the effect of declaring the challenged tax exemption invalid might increase the taxes applicable to some publications (possibly creating a burden on speech rights), it is immaterial

---

[30] Ragland at 227, quoting Orr v. Orr at 273.

that a declaratory judgment in Keeler's favor might also have the effect of removing the benefit granted to those who wish to display the Choose Life plate.

Further, the outcome of this litigation need not result in the authorization of a Choose Choice license plate. As was the case in Ragland and Orr, plaintiff Keeler may prevail in her quest to declare the Choose Life license plate statute unconstitutional and not achieve authorization from the Louisiana legislature for a Choose Choice license plate.[31] It is sufficient that the plaintiff seek, as does Plaintiff Keeler, to simply remove the discriminatory benefit granted to others and thereby create a level playing field for all affected by the statute. Keeler has alleged a sufficiently personal stake in the outcome of this litigation and this constitutional attack holds the only promise of escape from the burden on her free speech rights that derives from the challenged statute.[32]

IV.

In summary, I would find that plaintiff Keeler has standing to assert her First Amendment claims. Under relaxed standing

---

[31] Orr at 273, Ragland at 1726-27.

[32] Id.

40

principles recognized in First Amendment cases, she has standing to bring a facial challenge to the Choose Life statute. This statute is an application of Louisiana's system of permitting the state legislature to authorize specialty license plates without standards or constraints, which in this instance promotes state sponsored viewpoint discrimination. In addition, applying traditional standing analysis, I would hold that Plaintiff Keeler has established a personal injury fairly traceable to the defendant's allegedly unlawful conduct that is likely to be redressed by the requested relief.

In this case, the state sponsored the viewpoint of a select group. This burdened those holding a contrary view who were unable to express their views in the state sponsored forum. As in Ragland, plaintiff's "constitutional attacks holds the only promise of escape from the burden that derives from the challenged statute." Stated differently, the majority's unduly narrow application of standing principles to this First Amendment case precludes any plaintiff from attacking the constitutionality of the Choose Life statute.

Because the majority dismissed this case for lack of standing, the court does not reach the merits of the preliminary injunction.

For reasons stated above, I would find that plaintiff Keeler has standing and, on the merits, I would affirm the district court's preliminary injunction, essentially for the reasons stated by the district court and remand for entry of a permanent injunction against the implementation of LA.R.S. 47:463.61.